IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

FEB 18   1 41 PM '03

CLERK
BY _____
DEPUTY CLERK

|                                                      |   |
|------------------------------------------------------|---|
| FOREST WATCH,                                        | ) |
| FOREST CONSERVATION                                  | ) |
| COUNCIL, AND FRIENDS OF THE                          | ) |
| EARTH                                                | ) |
|                                                      | ) |
|                                                      | ) |
| Plaintiffs,                                          | ) |
|                                                      | ) |
|                                                      | ) |
| vs.                                                  | ) |
|                                                      | ) |
| UNITED STATES FOREST                                 | ) |
| SERVICE,                                             | ) |
|                                                      | ) |
| Defendant.                                           | ) |

Case No. 1:03-cv-55

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### PRELIMINARY STATEMENT

1.      Congress entrusted the United States Forest Service ("USFS" or "Forest Service") with

the stewardship of a national treasure -- the vast and varied resources of the country's national

forest lands.

2.      This case concerns the USFS's haphazard and illegal management of the enormous and

varied resources that are found within the Green Mountain National Forest ("GMNF"). The

USFS' mismanagement has resulted in it improperly authorizing a logging project called the Old

Joe Project. The Old Joe Project fails to comply with applicable law, and as a result the Forest

Service is squandering significant natural resources, and is causing actionable injury to the

Plaintiffs' interests.

3.      The Old Joe Project is located in the Green Mountain National Forest in the Towns

of Rochester and Chittenden, Vermont, and is projected to result in the removal of approximately

1 million board feet of timber.  More specifically, the Old Joe Project area can be found on the

western flank of the Green Mountain range on either side of Route 73 (the Brandon Gap road),

just as the highway enters the broad, flat portions of the White River Valley.  The project has two

main sections: Chittenden Brook and Bingo Brook.

4.      The Chittenden Brook section of the project area is on the southside of the highway and

is accessed via Forest Road 45, a long, narrow, dead end dirt road running alongside Chittenden

Brook and climbing steadily into a section of remote, quiet backcountry on the Green Mountain

National Forest.  Joe Smith Brook, a beautiful little stream on the east side of Chittenden Brook

and Forest Road 45, drains the western slopes of Corporation Mountain, and forms the edge of

several of the proposed logging units.  Large, mature hardwoods and rugged, steep mountain

slopes dominate the views seen from popular cross country ski trail and picnic spots along the

lower stretch of the road where the logging is proposed.

5.      The Bingo Brook section of the project area is on the northside of Route 73 and is

accessed via Forest Road 42, a long, narrow, dead end dirt road running directly alongside Bingo

Brook and climbing steadily into a large, remote, backcountry basin that has been proposed for

federal Wilderness designation. Bingo Brook is well known for its high water quality,

extraordinary beauty, abundant trout fishery, and outstanding whitewater boating opportunities.

Unlike typical, boulder-strewn New England streams, Bingo Brook has many long, sloping slabs

of rock ending in deep, clear pools of water. An extremely steep slope—the north face of Little

Pico Mountain—rises immediately to the south of the road and Bingo Brook, and is covered with

big, old trees and laced with small feeder streams. The USFS proposes to log trees on this slope.

2

6.      USFS mismanagement of the GMNF challenged in this case focuses on the following concerns: (1) the USFS marked trees for cutting prior to any authorization to do so, and failed to disclose this in its environmental analysis for the Old Joe Project thereby prejudicing the selection of reasonable alternatives, and compromising important recreational values, (2) the USFS' failure to adhere to standards set forth in the Green Mountain Land and Resource Management Plan ("LRMP" or "Forest Plan") related to the physical suitability of lands within the Old Joe Project area for logging, (3) the USFS' failure to acquire and analyze population data for certain wildlife species according to the requirements of National Forest Management Act and the LRMP prior to rendering the final decision to proceed with the proposed Old Joe Project and (4) the USFS' failure to consider numerous economic and social values associated with the GMNF.

## MARKING TREES FOR LOGGING WITHOUT AUTHORIZATION

7.      Trees within the Old Joe Project were individually painted by the USFS with green and dark blue paint to identify them for cutting and removal.

8.      Some of the painted trees are located near two streams identified by the LRMP as "Significant Streams," Bingo Brook and Chittenden Brook, and along Joe Smith Brook. The Significant Streams are eligible and to be reviewed for classification as Recreational Rivers. The painted trees are within corridors to be protected for the Significant Streams. Paint marks may be visible by recreationists traveling along Bingo Brook, and may be seen by paddlers and anglers of Bingo Brook.

9.      These trees were painted after an earlier decision to proceed with the Old Joe Project had been withdrawn by the USFS, and prior to any new USFS Record of Decision to authorize

3

commencement of the project in the area. Therefore, adequate legal authorization to paint the trees did not exist at the time they were marked.

10.    Painting these trees without authorization and prior to completion of the decision making process, violates applicable statutes and regulations, and prejudices the USFS decision making process, particularly for review of a "no action" alternative. 42 U.S.C. §4332(c), 40 C.F.R. 1506.1(a) & (c), 16 U.S.C. §1604(i), and 36 C.F.R. §219.3.

<b>PHYSICAL SUITABILITY OF AFFECTED LANDS</b>

11.    NFMA requires the Forest Service to ensure that timber will be harvested only where soil, slope, or other watershed conditions will not be irreversibly damaged, and in a manner that complies with the requirements of applicable laws and the LRMP. Among other things, the agency must ensure that logging will not detrimentally affect streams and stream banks by loading sediment, blocking flows, or changing water temperatures. 16 U.S.C. §1604(g)(3)(E). The Forest Service promises to meet these statutory mandates by following the LRMP's guidance with respect to logging activities on forest land. 16 U.S.C. §1604(i). The LRMP establishes standards intended to ensure that logging is suitable given conditions found on the ground.

12.    In several respects, the Old Joe Project would violate the parameters set forth in the LRMP. These violations would include, but not be limited to, skidding timber for extended distances on slopes greater than 15%, skidding timber across streams, and removing trees now providing shade to water courses. As a result, the decision to proceed with the Old Joe Project violates NFMA, the LRMP, and the APA.

4

## "MANAGEMENT INDICATOR SPECIES"

13.     Pursuant to NFMA and the LRMP, the Forest Service has an obligation to monitor

populations data for wildlife species that the agency designates as "management indicator

species." By monitoring population trends of the "management indicator species" and relating

observed changes in those trends to past management activities, the Forest Service can assure

that its timber sale, roadbuilding and other management activities are not having an adverse

effect on wildlife diversity.

14.     The LRMP prepared for the Green Mountain National Forest expressly requires the

Forest Service to monitor populations of the species identified by the Forest Service as

"management indicator species" for the Green Mountain National Forest.

15.     The Forest Service decided to proceed with the Old Joe Project despite the fact that it has

not first acquired the required population data for the "management indicator species" as required

by both NFMA and the LRMP.  The decision to proceed with the Old Joe Project; therefore,

violates NFMA and the APA.  16 U.S.C. §1604(i); 36 C.F.R. §219.19(a)(6).

## SOCIAL AND ECONOMIC CONSIDERATIONS

16.     National forest lands, including the Green Mountain National Forest, provide many

important social and economic contributions to the nation.  These contributions include uses,

such as recreation, tourism, hunting, and fishing; functions, such as flood control, nutrient

cycling, soil production, purification of water, carbon sequestering, pollination, pest control,

wildlife habitat, and waste recycling; values, such as scenic, cultural, and aesthetic enjoyment;

and products, including traditional forest products (such as timber, livestock forage, and

minerals) and non-traditional forest products (such as plants used in the manufacture of

medicines, edible mushrooms, and floral greens). Together, all these social and economic contributions are known as ecosystem services.

17.     When the USFS adopted new regulations concerning planning activities on national forest lands, it acknowledged its obligation to consider and account for all the ecosystem services that the national forests provide. The Federal Register accompanying the new regulations states that "[t]he first priority for stewardship of the national forests and grasslands is to maintain or restore ecological sustainability to provide a sustainable flow of uses, values, products, and services from these lands."[1]

18.     The production of the traditional market commodities (such as timber, livestock forage, and minerals) is just one of the many ecosystem services of national forest lands. In fact, in recent years, the value of the traditional market products is increasingly insignificant relative to the value of the other ecosystem services provided by national forest lands. For example, the USFS recently estimated that national forest recreation programs alone generates 32 times more gross domestic product and 38 times more jobs than national forest timber sales annually.

19.     Likewise, a recent chief of the USFS, Mike Dombeck, spoke of the extraordinary value of the national forest's water resources while he was chief:

---

[1]     The new planning regulations were adopted on November 9, 2000, but since that time the Forest Service has determined that "adjustments" to the new planning regulations are necessary. National Forest System Land and Resource Management Planning; Proposed Rules, 67 Fed. Reg. 72,770 (Dec. 12, 2002). The Forest Service published notice concerning implementation of the new planning regulations while those regulations are under review. Id. According to that notice, amendments and revisions to Land and Resource Management Plans may be prepared under either the old or the new planning regulations. Id. Site-specific decisions for management actions, such as timber sales, may be made pursuant to the old planning regulations until November 9, 2003. Id. The Old Joe Project was prepared pursuant to the old planning regulations.

> We recently assessed the marginal value of water on National Forest lands to be
> more than $3.7 billion per year. This $3.7 billion does not include the value of
> maintaining fish species, many other recreation values, nor the savings to
> municipalities who have reduced filtration costs because water from National
> Forests is so clean. Nor does it account for the millions of visitor days where
> people are fulfilled by the simple act of walking beside a cool clear stream, river,
> or lake. Healthy watersheds that produce high quality water also provide for a
> long-term sustained yield of other goods, values, and services.

20.     Pursuant to the statutes that govern management of national forest lands -- the Multiple-

Use Sustained-Yield Act ("MUSY"), 16 U.S.C. §528 et seq., the Forest and Rangeland

Renewable Resources Planning Act ("RPA"), 16 U.S.C. §1600 et seq., the NFMA, 16 U.S.C.

§1600 et seq., and the NEPA, 42 U.S.C. §4321 et seq. -- the USFS has a procedural obligation to

consider and account for all the various economic values of the national forests lands when it

makes decisions concerning the management of those lands.

21.     Additionally, pursuant to the national forest management statutes, the Forest Service has

a substantive obligation to assure that its management of national forest lands maximizes the

value of the resource output "mix" from public lands.  For example, the USFS regulations

implementing NFMA require the Forest Service to "maximize the net public benefit" derived

from national forest lands. 36 C.F.R. §219.1.

22.     The USFS has consistently failed to comply with both its procedural and substantive

obligations to account for and maximize all economic values on the national forests when it

decides to undertake timber harvest activities.

23.     Instead of considering all economic values in timber sale planning, the Forest Service

concededly limits its analyses to timber-related values and costs.  In planning timber sale

activities, the Forest Service routinely fails to consider and account for the positive values

7

(benefits) of the national forests in their natural and unlogged condition and routinely fails to consider and account for the negative values (costs) and externalities that are incurred in cutting trees on national forest lands.

24.     In making decisions regarding timber sales on national forest lands, the USFS entirely ignores the fact that national forest lands produce ecosystem services and non-traditional products which are as valuable to the public, or more valuable to the public, than the value of the timber. The USFS ignores these various values, despite the fact that it is well known that a flow of economically valuable goods and services will continue if the affected forests are simply left alone.

25.     The USFS also ignore the costs and externalities associated with timber cutting activities. For example, the USFS fails to recognize the non-market externalized costs associated with water pollution, lost recreational opportunities, lost scenic and aesthetic values, and damages to economically valuable wildlife, fish, and plant species.

26.     As a result of the USFS's failure to consider and account for all market and non-market benefits and costs associated with its timber sale activities, the USFS understates the economic importance of the national forests' ecosystem services and overstates the value of the timber resource, thereby injuring the plaintiffs' legally protectable interests.

27.     The failure of the USFS's analyses in this regard is arbitrary and capricious, and not in accordance with law. Furthermore, the USFS's failure justifies and perpetuates the USFS's institutional bias in favor of logging on national forests, and gives rise to the statutory and regulatory violations alleged herein.

8

## JURISDICTION AND VENUE

28.     Jurisdiction of this action is based on 28 U.S.C. §1331 (federal question jurisdiction),

28 U.S.C. §1361 (mandamus), and 5 U.S.C. §701 et seq. (APA).

29.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(e) because this is

an action against an agency of the United States, a substantial part of the events that give rise to

this action occurred in this district, and because some of the plaintiffs and/or their members

reside in this district.

30.     There exists now between the parties hereto an actual, justiciable controversy in which

the plaintiffs are entitled to have a declaration of their rights and of the defendant's obligations,

and further relief, because of the facts and circumstances hereinafter set out.

## PARTIES

31.     Forest Watch ("FW") is a 6,500- member, non-profit conservation organization located

in Montpelier, Vermont.  Over 3,000 Forest Watch members live in Vermont. FW uses

grassroots organizing, advocacy, education, and negotiation to promote sound management of

New England forests, including national forest lands.  Historically, Forest Watch has been the

watchdog for public lands in Vermont, and has presented a clear and consistent voice for

wilderness, wildlife, and recreation since it was established in 1994.  The members of Forest

Watch use the Green Mountain National Forest and other National Forest lands in the

northeastern United States for recreational, aesthetic, educational and scientific purposes on a

regular basis.  Among other activities enjoyed by the membership, are hunting, fishing, hiking,

camping, photography, boating, collection of alternative forest products, and wildlife watching.

The national forest logging program, including the proposed Old Joe project, harms FW

9

members by displacing or eliminating these uses. National forest timber sales have and continue to pollute clean water sources, fragment and destroy wildlife habitat, mar scenic vistas, and degrade native biological diversity. These impacts have and continue to make national forest lands unsuitable for the recreational, aesthetic, and scientific uses pursued by FW members. FW members have hiked, visited, paddled, and enjoyed the sites subject to the proposed Old Joe Project, and plan to so again on at least an annual basis in the foreseeable future. FW and its members have consistently challenged Forest Service timber sales, including the Old Joe Project and an amendment to the Green Mountain National Forest LRMP, seeking relief that would mitigate the effects of such sales and plan amendments on FW members, and the various ecological, social and economic values of national forests important to FW members. The Forest Service has ignored the vast majority of FW concerns in the context of final decisions on the Old Joe Project and plan amendment.

32.     Forest Conservation Council ("FCC") is a non-profit environmental organization incorporated in Oregon and based in Santa Fe, New Mexico. FCC's membership includes individual, business, and organizational members in many states. FCC's mission is to protect and restore the ecological integrity of forests on public lands and to promote sustainable management of state and private forests. FCC's members regularly use and enjoy the clean water and air, wildlife, scenery, recreation opportunities, and biological diversity of national forests, including the timber sale area that is the subject of this complaint. FCC has filed administrative appeals of the Old Joe Project and an amendment to the Green Mountain National Forest LRMP requesting that the Forest Service address all of the adverse social and economic

10

effects that its timber sale program decisions have on its members. FCC's requests for relief have been denied.

33.     Friends of the Earth ("FoE") is an environmental advocacy organization founded in 1969 and incorporated in the District of Columbia. FoE has offices in Burlington, Vermont. I t has approximately 20,000 members across the nation who live, work, and recreate on national forest lands. The mission of FoE is to protect the planet from environmental degradation; preserving biological, cultural and ethnic diversity; and to empower citizens to affect the quality of their environment and their lives. One of FoE's programs is to use the discipline of economics to encourage better stewardship of natural resources. Members of FoE hike, ski, observe wildlife and ecosystems, camp, climb, and generally use the land managed by the Forest Service affected by timber sales challenged in this suit for recreation, education, and enjoyment. FoE has filed administrative appeals of the Old Joe Project and amendments to the Green Mountain National Forest LRMP requesting that the Forest Service address the lost social and economic values of national forest lands important to its members. In this appeal, the Forest Service has failed to grant the relief sought by FoE.

34.     Defendant United States Forest Service is an agency of the United States Department of Agriculture. Officers and employees of the United States Forest Service are responsible for managing the country's national forest lands and resources, and for faithfully executing the laws of Congress and administrative regulations and rules in the management of those lands and resources.

## ESSENTIAL FACTS

A.   NEPA and NFMA prohibit actions which limit and/or prejudice the selection of reasonable alternatives prior to completing the NEPA process

35.    Trees within the Old Joe Project area have already been painted with green and dark blue paint, an activity used by the USFS to identify trees selected for cutting and removal.

36.    The green paint stripes on the trees are located approximately five feet above ground level, and the blue paint stripes on the trees are located approximately eight feet above ground level.

37.    Some of the painted trees are located along two streams identified by the LRMP as "Significant Streams," Bingo Brook and Chittenden Brook. These Significant Streams are eligible and to be reviewed for classification as Recreational Rivers. The painted trees are within corridors to be protected along Significant Streams, visible by hikers in the area, and anglers and paddlers of Bingo Brook

38.    Bingo Brook and Chittenden Brook are identified as Significant Streams in the LRMP because of their potential to provide outstanding recreational opportunities.

39.    The large, boldly painted slashes, Xs, numbers, and letters marring these trees compromise the natural beauty of the forest and the areas' recreational qualities.

40.    The trees were painted during the months of November and December 1998, and May 1999.

41.    The Forest Service withdrew the prior Old Joe Project Record of Decision on November 13, 1998.

42.    The Record of Decision for the new Old Joe Project is dated August 19, 2002.

12

43.    These trees were painted after an earlier decision to proceed with the Old Joe Project had been withdrawn, and prior to any new USFS Record of Decision authorizing commencement of the project in the area. Therefore, no legal authorization to paint the trees existed at the time they were marked.

44.    Moreover, the Revised Environmental Assessment for the Old Joe project failed to mention that the marking had already been done and included false, misleading information indicating that it had not yet occurred.

45.    Painting these trees without authorization violates applicable statutes and regulations, and prejudices the USFS NEPA decision making process, particularly for review of a "no action" alternative, and is a violation of NFMA. 42 U.S.C. §4332(c), 40 C.F.R. 1506.1(a) & (c), 16 U.S.C. §1604(i), and 36 C.F.R. §219.3.

       B.    The Forest Service is required to follow the Forest Plan with respect to the physical suitability of timber harvesting on affected lands in the Green Mountain National Forest.

46.    The Forest Service is required to ensure that logging will be undertaken only in a manner consistent with the LRMP, including only to permit clearcutting in a manner consistent with the guidelines of the LRMP, and not to detrimentally affect streams and stream banks by loading sediment, blocking flows, or changing water temperatures and that soil, slope, and other watershed conditions will not be irreversibly damaged. 16 U.S.C. §1604(i); 16 U.S.C. § 1604(g)(3)(E).

47.    Revised Environmental Assessment shows that the Old Joe Project fails to provide the assurances of protection for streams and stream banks required by NFMA and the LRMP.

48.     The Environmental Assessment describes wet soils and steep slopes in the proposed

project area.  It also notes that there will be extended skidding of felled trees over these fragile

soils and down these steep slopes.  The Forest Service concedes that logging and skidding timber

on steep slopes and across streams will cause soil loss and sediment loading.  Revised

Environmental Assessment at 3-35 to 3-38.  The steepness of slopes in the proposed sale area,

and the wetness of the soils, makes land within the sale area unsuitable for timber harvesting

under the parameters of the Forest Plan.

49.     NFMA requires that all Forest Service management actions -- including timber sales -- be

consistent with the underlying Forest Plan.  16 U.S.C. §1604(i).  The Green Mountain Forest

Plan states that "[s]kid trails will exceed 15% only in short pitches where soils are drained well

enough to allow erosion control structures to be maintained in working order at all times."

LRMP at 4.24.  The Old Joe EA concedes that the main skid trail climbs at a consistent grade

between 25 to 30 % through much of Stand Four.  And it concedes that this slope is greater than

that allowed by the Forest Plan.  EA at 3-37.  Indeed, in spots the slope will be between 40 to

50%. in many stands within Old Joe.  EA at 3-38.  Undoubtedly, using a bulldozer to construct

skid trails and bunch trees and logging on these steep, poorly drained slopes will result in erosion

and sedimentation of streams in the proposed sale area. That is why the LRMP guards against

such practices.

50.     The EA itself concedes that "[s]oils throughout most of the project area have a moderate

to high erosion hazard, due to the moderately steep slopes (15-40 percent slopes, except as noted

in Table III-5)."  EA at 3-35.  Add to this the fact that the Forest Service has marked for cutting,

large trees within a few feet of streams and intends to skid them across streams, and the risk of

14

significant erosion is considerably heightened. (According to the Forest Plan, "[v]egetation

within the strip that provides shade to the stream will be maintained." LRMP at 4.20.

According to the Forest Plan,"[s]kidding will not be allowed in water courses." LRMP at 4.24.

Given the physical conditions of the project area, however, that appears to be unavoidable. In

short, despite NFMA's mandate that the Forest Service ensure that watershed conditions will not

be irreversibly damaged, the agency is intent on degrading water quality and Significant Streams

in the Old Joe sale area.

     C.    The Forest Service is required to acquire and consider population data for
"management indicator species" designated for the Green Mountain National Forest.

51.    In order to ensure that Forest Service management activities -- including timber sales --

do not have an adverse impact on biodiversity, the Forest Service is required to designate and

systematically collect and analyze data on a set of representative "management indicator species"

for each national forest.

52.    The Forest Service has an obligation to select "management indicator species" that can

serve as proxies for all the wildlife species -- both terrestrial and aquatic -- found within a

particular national forest.

53.    Thus, by systematically monitoring population data of "management indicator species,"

and studying how different USFS management actions affected those populations, the Forest

Service can predict how its future management activities -- including timber sales --will affect

native wildlife and biodiversity.

54.    Forest Service regulations implementing NFMA specifically require the Forest Service to

acquire quantitative population data for "management indicator species" on an on-going basis, in

15

order to monitor and assess the impacts of its management activities on "management indicator species," as well as the other species they represent. In particular, the regulations direct that "[p]opulation trends of the "management indicator species" will be monitored and relationships to habitat changes determined." 36 C.F.R. §219.19(a)(6).

55.     NFMA regulations further state that "planning alternatives shall be stated and evaluated in terms of both amount and quantity of habitat and of animal population trends of the management indicator species." 36 C.F.R. §219.19(a)(2).

56.     NFMA also requires that plant and animal diversity be considered throughout the planning process, and that "inventories shall include quantitative data." 36 C.F.R. §219.26.

57.     NFMA regulations also require that the Forest Service must "obtain and keep current inventory data appropriate for planning and managing the resources" of national forest lands. 36 C.F.R. §219.12(d).

58.     Additionally, the Forest Plan for the Green Mountain National Forest requires the acquisition of population data for "management indicator species." The Monitoring Plan that the Forest Service incorporated into the Forest Plan specifically requires the Forest Service to "[d]etermine population trends of indicator species to estimate viability." The Monitoring Plan also specifies the monitoring method to be used in acquiring population data for certain "management indicator species," and the frequency it is to be collected ranging from annually to every five years depending on the species.

59.     For the Green Mountain National Forest, the Forest Service has designated the following species as "management indicator species": Chestnut-Sided Warbler, Barred Owl, Snowshoe Hare, Blackpoll Warbler, White-Tailed Deer, Ruffed Grouse, Beaver,

16

Yellow-Bellied Sapsucker, Gray Squirrel, American Woodcock, Brook Trout, American Bittern, Peregrine Falcon, and Tree Swallow.

60.     The LRMP requires population data to be measured for the Chestnut-sided warbler every three years. This management indicator species is not so reclusive that no technically reliable and cost-effective way to count individual species members exists. Yet, he USFS has failed to acquire population data in accordance with the every three years.

61.     The LRMP requires population data to be measured for the Barred Owl annually. This management indicator species is not so reclusive that no technically reliable and cost-effective way to count individual species members exists. The USFS has failed to acquire population data for the Barred Owl annually.

62.     The LRMP requires population data to be measured for the Snowshoe Hare every five years. This management indicator species is not so reclusive that no technically reliable and cost-effective way to count individual species members exists. The USFS has failed to acquire population data for the Snowshoe Hare every five years.

63.     The LRMP requires population data to be measured for the Blackpoll Warbler annually. This management indicator species is not so reclusive that no technically reliable and cost-effective way to count individual species members exists. The USFS has failed to acquire population data for the Blackpoll Warbler annually.

64.     The LRMP requires population data to be measured for the White-Tailed Deer annually. This management indicator species is not so reclusive that no technically reliable and cost-effective way to count individual species members exists. The USFS

17

has failed to acquire population data for the White-Tailed Deer annually.

65.    The LRMP requires population data to be measured for the Ruffed grouse annually. This management indicator species is not so reclusive that no technically reliable and cost-effective way to count individual species members exists. The USFS has failed to acquire population data for the Ruffed grouse annually.

66.    The LRMP requires population data to be measured for the Beaver every five years. This management indicator species is not so reclusive that no technically reliable and cost-effective way to count individual species members exists. The USFS has failed to acquire population data for the Beaver every five years.

67.    The LRMP requires population data to be measured for the Yellow-bellied sapsucker annually. This management indicator species is not so reclusive that no technically reliable and cost-effective way to count individual species members exists. The USFS has failed to acquire population data for the Yellow-bellied sapsucker annually.

68.    The LRMP requires population data to be measured for the Gray Squirrel annually. This management indicator species is not so reclusive that no technically reliable and cost-effective way to count individual species members exists. The USFS has failed to acquire population data for the Gray Squirrel annually.

69.    The LRMP requires population data to be measured for the American woodcock annually. This management indicator species is not so reclusive that no technically reliable and cost-effective way to count individual species members exists. The USFS has failed to acquire population data for the American woodcock annually.

18

70. The LRMP requires population data to be measured for Brook trout annually. This management indicator species is not so reclusive that no technically reliable and cost-effective way to count individual species members exists. The USFS has failed to acquire population data for Brook trout in accordance in accordance with the requirements of the LRMP and 36 C.F.R. §219.19.

71. The LRMP requires population data to be measured for the Tree swallow every two years. This management indicator species is not so reclusive that no technically reliable and cost-effective way to count individual species members exists. The USFS has failed to acquire population data for the Tree swallow every two years.

72. The LRMP requires population data to be measured for the American Bittern annually. This management indicator species is not so reclusive that no technically reliable and cost-effective way to count individual species members exists. The USFS has failed to acquire population data for the American Bittern annually.

73. The LRMP requires population data to be measured for the Peregrine Falcon annually. This management indicator species is not so reclusive that no technically reliable and cost-effective way to count individual species members exists.

74. The Forest Service decided to proceed with the Old Joe Project despite the fact that it has not collected or assessed population data according to the requirements of the LRMP for any of the "management indicator species" designated by the Forest Service in the Forest Plan for the Green Mountain National Forest.

75. With regard to the management indicator species data, the USFS acknowledges "data is indeed lacking," and concedes that "the information does not indicate a clear trend" for certain

19

species.  Old Joe Revised EA, Appendix G, G-28.

76.     The USFS has failed to acquire or analyze quantitative population data, including the number of animals or reproductive animals found in the planning area, for any of the management indicator species for the GMNF with the frequency called for in LRMP.

77.     The failure of the Forest Service to acquire population data pursuant to NFMA in a manner consistent with the Forest Plan for the "management indicator species" prior to rendering a decision to proceed with the Old Joe Project creates a risk that Forest Service management activities may cause unanticipated and/or unknown risks to wildlife species and native biodiversity, and is a violation of NFMA and the LRMP.  16 U.S.C. §1604(i), 36 C.F.R. §219.19(a)(6), 36 C.F.R. §219.12(d).

> D.     The country's national forest lands provide numerous valuable products to the American people.

78.     The national forest lands of the United States are the repository and the source of a vast amount of national wealth.

79.     The country's national forests provide ecosystem services in the form of uses, values, products, and functions that are worth many billions of dollars each year.

80.     The national forest lands' traditional market-based products -- timber, livestock forage, and minerals -- contribute only a small portion of the total value of ecosystem services provided by the national forest lands.

81.     Indeed, even the Forest Service, which administers the country's national forest lands, acknowledges that the non-commodity goods and services of the country's national forest lands provide the lion's share of the national forests' economic value to the American people.

82.     By way of example, the economic value of recreational opportunities on national forest lands far exceeds the economic value of the national forests' timber resource. According to a Forest Service analysis, recreation on national forest lands was expected to contribute $110 billion annually to the economy's gross domestic product by the year 2000, and to provide 2,894,000 jobs nationally through direct, indirect, and induced employment effects.

83.     Timber cutting activities, on the other hand, were expected to contribute a comparatively insignificant $3.5 billion to the country's gross domestic product by the year 2000, and to provide only 75,900 jobs nationally.

84.     As another example, the Forest Service acknowledges that the country's national forests provide surface water resources whose collective value, on an annual basis, exceeds the value of the national forests' timber resource. While, as noted above, the value of the timber resource was expected to be $3.5 billion annually by the year 2000, the value of the surface water resources of the national forests to the national economy is $3.7 billion annually.

85.     When the value of all the various "ecosystem services" and "non-traditional products" of the country's national forest lands are aggregated, the value vastly exceeds the value of the national forests' timber resource.

86.     Additionally, the national forests' timber resource is relatively insignificant to the national timber supply. National forest lands provide less that 5% of the nation's timber supply each year. That small amount of timber could be easily replaced with timber from state and/or private lands. On the other hand, many of the valuable ecosystem services provided by national forest  lands cannot be replaced elsewhere -- the recreational opportunities and the wildlife

21

habitat provided by the national forests, for example, cannot be found off the national forests

once they are destroyed or adversely affected by timber cutting activities.

> 1. The relevant management statutes require the Forest Service to account for the relative value of all resources in management decisions at all administrative levels.

87.     The various federal laws that govern the management of the country's national forest

lands all recognize that the public welfare is best served by a management regime that recognizes

and accounts for the relative value of all the various resources of the national forests, and not just

the traditional market-based commodities.

88.     Those laws -- including MUSY, the RPA, NFMA, and NEPA -- all require the Forest

Service to consider and to account for the relative value of all the national forest resources in the

development of management plans for national forest lands.

89.     More specifically, MUSY, the RPA, NFMA, and the NEPA impose both procedural

and substantive duties on the Forest Service that are intended to assure that traditional market-

based products -- such as the timber resource -- are not given undue emphasis in the agency's

management of the country's national forest lands.  Indeed, one USFS regulation was

promulgated to ensure that timber values do not predominate above other national forest values

in land management planning.  The regulations state that "[m]anagement prescriptions that

involve [timber harvest] . . . shall not be chosen primarily because they will give the greatest

dollar output of timber, although these factors shall be considered." 36 C.F.R. §219.27(b)(3).

90.     Under the management scheme prescribed by statute, the management of the country's

national forests requires decision making at various administrative levels.  Every site-specific

Forest Service action, such as a timber sale, proceeds pursuant to the Forest Service's final

decisions at various planning levels. The Forest Service divides its planning and management activities into three administrative levels: national-level, forest-level, and site-specific. 36 C.F.R. §219.4(a).

91.     At the national level, the Forest Service prepares the Renewable Resources Program ("RPA Program"), which determines output levels for all National forest resources based upon a comprehensive environmental and economic assessment of present and anticipated demands for and supply of renewable resources from forests in all ownership.

92.     At the forest level, the Forest Service prepares a Forest Plan for each national forest. According to the Forest Service, these LRMPs are "extensions" of the RPA Program and identify lands that are suitable for timber sales, the amount of timber to be offered each year, and the conditions under which timber sales will be offered.

93.     Finally, at the site-specific or project level, the Forest Service makes decisions about the specific configuration of individual timber sales such as the Old Joe project.

94.     At each of these planning levels, the Forest Service must incorporate information about the relative value of all national forest resources and all of the market and non-market social and economic benefits and costs of its timber sale program so that the final timber sale decisions reflect a land use that maximizes net public benefits.

95.     At each of the three administrative levels, the Forest Service has both procedural and substantive obligations under MUSY, the RPA, NFMA, and NEPA.

96.     Procedurally, the Forest Service has a mandatory obligation under MUSY, the RPA, NFMA, and NEPA to ensure that the analyses it prepares to accompany its management decisions affecting national forest lands incorporate a full and objective assessment of all the

23

various social and economic costs and benefits associated with national forest management. 16

U.S.C. §§529, 1602, 1604, 42 U.S.C. §4332.

97.     In various planning documents, the USFS acknowledges the nature and

importance of this procedural obligation. For example, the LRMP for the Green

Mountain National Forest states that the USFS:

- Will not sacrifice water quality, recreation, aesthetic, wildlife and other non-priced values in order to maximize financial revenues from the sale of timber . . .
- Timber will be cut where financial revenues fall below financial costs when the public desires the resulting nonpriced benefits and the Forest Service decides they clearly justify cutting.

98.     This procedural obligation and the pertinent planning statutes require the Forest Service

to consider fully not only the values associated with the traditional market-based products of the

national forests, but also to consider the value of the various "ecosystem services" and "non-

traditional products" whenever monetary values may be assigned.

99.     The pertinent planning statutes and the Green Mountain LRMP also impose a

procedural obligation upon the USFS to consider and account for all the costs and externalities

associated with the production of market-based products on national forest lands, including the

externalities that arise when logged forests are no longer able to contribute ecosystem services to

the public.

100.    Substantively, the Forest Service has a mandatory obligation under MUSY, the RPA,

and NFMA to ensure that its management decisions affecting the use and disposal of the various

resources of national forest lands maximize the net public benefit of those resources to the

American public. 16 U.S.C. §§528, 1602, 1604, 1606.

2.   The Forest Service's decisions to proceed with the Old Joe Project are critically flawed because the USFS failed to account for and consider all the values of national forest lands, and thereby failed to maximize the net public benefit of national forest lands.

101.   The USFS' decision to proceed with the Old Joe Project is of urgent concern to plaintiffs because of the immense market and non-market ecosystem service values associated with the irreplaceable forests contained within the sale's boundaries, the externalized costs logging such areas will have on plaintiffs' members, and the Forest Service's total failure to consider such values and costs. Accordingly, the decisions to proceed with these sales violate MUSY, the RPA, NFMA, and NEPA.

102.   At the national, forest, and site-specific levels of planning, the Old Joe Project is flawed by the USFS's failure to consider and account for the non-timber values of the lands within the timber sale area.

103.   The Forest Service has authorized the Old Joe Project, the LRMP to which it is tiered, and the RPA Program to which the LRMP is tiered in a manner that almost entirely ignores the vast ecosystem service values of national forests and the externalized costs of logging.

104.   National forest lands affected by the Old Joe Project generate many economic benefits simply by existing as natural ecosystems. Because these economic benefits are not generated by market transactions, they are known as non-market benefits. They include a wide variety of recreational uses such as cross-country skiing, hiking, hunting, fishing, boating, camping, scenic viewing, gathering of non-timber forest products, and wildlife watching. They include scenery and aesthetic beauty that enhance the value of nearby private homes and properties. They include habitat for reclusive species such as black bear, fisher, pine marten, and migratory bird

25

species that are sought after by wildlife watchers and game species such as brook trout, deer, and grouse sought out by hunters and fishers. They include water filtration services for downstream users and regulation of flooding.

105.    When national forests are logged, many of these benefits disappear. Others are diminished. These are known as "externalized costs," and are incurred by individuals, businesses, and communities who enjoy the economic benefits of unlogged forests.

106.    Logging and associated road building in the Old Joe Project area, coupled with reasonably foreseeable logging, land development, road building, and other land disturbing activities in other parts of the Chittenden and Bingo Brook watersheds and surrounding region will degrade lands highly valued for primitive recreation, wildlife watching, whitewater boating, hunting, and fishing. The sights and sounds of logging will have a negative impact on recreation and enjoyment of nearby private properties. Sedimentation caused by logging and road building may increase water filtration costs for downstream water users. Habitat for reclusive species will be eliminated, adversely affecting wildlife watching activities and diminishing passive use values associated with protecting these species.

107.    Economists have developed a powerful set of tools for quantifying all the economic benefits associated with the Old Joe timbers sale area in its current condition, and all of the externalized costs associated with logging. For example, economists use contingent valuation studies to quantify non-market benefits of providing protection for reclusive migratory bird species and maintaining water quality or quantifying the costs associated with a reduction of scenic values. Travel cost and random utility models are used to quantify the magnitude of recreational use and value as well as the adverse impacts of logging and road building. Hedonic

26

wage and housing models are used to quantify the economic benefits associated with living and working near protected landscapes such as Wild and Scenic Rivers, Significant Streams, or old growth forest reserves, and the economic costs associated with increased exposure to roads, log truck dangers, noise, and degraded scenery associated with logging.

108.    Original studies need not be completed to quantify non-market benefits and externalized costs. The Forest Service can simply use the vast number of studies already in existence by employing a low cost technique known as benefits transfer.

109.    Despite the availability of methods and sources of information to quantify non-market benefits and externalized costs, the Forest Service has failed to do so in the Old Joe environmental assessment. For example, in describing the "no action" alternative, the Forest Service assigns no value whatsoever to any of the economic uses and values generated by the Old Joe Project area in its natural state. Instead, the Forest Service assigns zero economic benefits to the no action alternative.

110.    Likewise, the Forest Service failed to account for any of the non-market economic costs associated with logging. Instead, the environmental assessment simply discloses a list of direct financial costs associated with sale administration, sale preparation, trail relocation, and implementation of KV fund projects.

111.    The Forest Service even failed to account for certain direct costs associated with logging. For instance, the costs of the tree marking that took place before the revised Old Joe Project EA was prepared should have been accounted for in all of the alternatives considered.

112.    Tree marking is a cost accounted for in the Sale Preparation line item of the USFS Economic Benefits and Costs analysis. Revised Old Joe Project EA, III-52.

27

113. Yet, the "no action" alternative has zero cost associated with Sale Preparation. Revised Old Joe Project EA, III-52.

114. Nor does the Green Mountain LRMP as amended contain any of the requisite information on non-market benefits and externalized costs of logging. Although the Green Mountain LRMP's goal is to authorize logging only when benefits exceed costs, the Green Mountain National Forest failed to compare the economic benefits generated by preservation against benefits generated by logging and failed to incorporate information about externalized costs of logging in deciding which lands were suitable for timber sales. The question of whether or not lands in the Green Mountain National Forest and the Old Joe project area are more valuable for non-timber uses and values or whether logging creates more socio-economic costs than benefits on these lands was never addressed.

115. In the Final Environmental Impact Statement ("FEIS") prepared for the LRMP and the Environmental Assessment ("EA") prepared for an amendment to the LRMP, the Green Mountain National Forest analyzes the various costs and benefits of implementing the Green Mountain LRMP. In the FEIS, however, the USFS failed to incorporate any information about the economic value of most non-timber values and uses and all externalized costs of logging. The only economic values incorporated into the FEIS include values for timber, livestock, downhill skiing, and several types of recreation. FEIS at 1.17-1.19. The only costs related to timber production include sale preparation, sale administration, reforestation, and timber stand improvement.

## CAUSES OF ACTION

### First Cause of Action
(Violations of the National Environmental Policy Act and the National Forest Management Act)

116.    The plaintiffs incorporate all the above paragraphs herein by reference.

117.    NEPA and the Council on Environmental Quality's (CEQ) regulations implementing

NEPA prohibits actions which would have an adverse environmental impact prior to preparing

the required NEPA procedures. The USFS painted trees to identify them for logging without any

legal authorization to do so. Some of the painted trees are located within the corridor of

Significant Streams, visible to hikers and paddlers, and are evidence of the USFS' failure to

objectively evaluate reasonable alternatives. The USFS' actions constitute a violation of NEPA,

NFMA, and the APA. 42 U.S.C. §4332(c), 40 C.F.R. 1506.1(a) & (c), 16 U.S.C. §1604(i), and

36 C.F.R. §219.3.

### Second Cause of Action
(Violations of the National Forest Management Act)

118.    The plaintiffs incorporate all the above paragraphs herein by reference.

119.    NFMA requires the Forest Service to ensure that logging will not detrimentally affect

streams and stream banks by loading sediment, blocking flows, or changing water temperatures

and that soil, slope, and other watershed conditions will not be irreversibly damaged. 16 U.S.C.

§ 1604(g)(3)(E). The Forest Service decided to proceed with the Old Joe Project despite the fact

that it has failed to ensure that this mandate will be satisfied. This failure is arbitrary and

capricious and constitutes a violation of NFMA and the APA.

### Third Cause of Action
(Violations of the National Forest Management Act)

120.    The plaintiffs incorporate all the above paragraphs herein by reference.

121.    NFMA requires that all Forest Service management actions – including timber sales – be consistent with the underlying Forest Plan. 16 U.S.C. §1604(i).

122.    The Forest Service decided to proceed with the Old Joe Project despite the fact that it has violated the express provisions of the Forest Plan for the Green Mountain National Forest by failing to follow plan parameters regarding logging and skidding on steep slopes, within streams, and within the stream shade zones.

123.    The Forest Service's decision to proceed with the Old Joe Project despite the fact that the agency is acting in a manner inconsistent with the Green Mountain Forest Plan is arbitrary and capricious and constitutes a violation of NFMA and the APA.

### Fourth Cause of Action
(Violations of the National Forest Management Act)

124.    The plaintiffs incorporate all the above paragraphs herein by reference.

125.    NFMA requires that all Forest Service management actions -- including timber sales -- be consistent with the underlying Forest Plan. 16 U.S.C. §1604(i).

126.    The Forest Service decided to proceed with the Old Joe Project despite the fact that the Forest Service has violated the express provisions of the Green Mountain National Forest LRMP by failing to monitor population trends of ""management indicator species"" within the Green Mountain National Forest as provided for by the LRMP.

30

127.     The Forest Service's decision to proceed with the Old Joe Project despite the fact that

the Forest Service is acting in a manner inconsistent with the Forest Plan for the Green Mountain

National Forest is arbitrary and capricious and constitutes a violation of NFMA and the APA.

### Fifth Cause of Action
(Violations of the National Forest Management Act)

128.     The plaintiffs incorporate all the above paragraphs herein by reference.

129.     NFMA requires that the Forest Service monitor population trends of "management

indicator species" to ensure that Forest Service management activities do not adversely affect

biodiversity.  36 C.F.R. §219.19(a)(6).

130.     The Forest Service decided to proceed with the Old Joe Project despite the fact that it

has not acquired and analyzed population data for the "management indicator species" found

within the Green Mountain National Forest consistent with the requirement of the LRMP.

131.     The failure to acquire such population data is arbitrary and capricious and constitutes a

violation of NFMA, the LRMP,  and the APA.  36 C.F.R. §219.19(a).

### Sixth Cause of Action
(Violations of the Multiple-Use Sustained-Yield Act)

132.     The plaintiffs incorporate all the above paragraphs herein by reference.

133.     The Forest Service's failure to undertake an analysis of the relative values of all the

various National forest natural resources in its national-level, forest level, and timber sale level

planning analyses -- including the analyses required by 16 U.S.C. §§1601, 1602, 1604, 1606(b),

and 1606(d) -- violates the procedural obligations imposed by MUSY and the APA, and makes it

impossible for the Forest Service to manage National forest lands and resources in a way that

maximizes net public benefit or otherwise fully accounts for all the market and non-market social

31

and economic benefits and costs associated with National forest lands and logging on those

lands.

134.     The Forest Service's failure to account for the all the various market and non-market

social and economic benefits and costs of its management plans and activities in its national-

level, forest level, and timber sale level planning-- including the analyses required by 16 U.S.C.

§§ 1601, 1602, 1604, 1606(b), and 1606(d) -- violates MUSY and the APA and makes it

impossible for the Forest Service to comply with its substantive obligation to manage National

forest lands and resources in a way that maximizes net public benefit or otherwise fully accounts

for all market and non-market social and economic benefits and costs associated with National

forest lands and logging on those lands.

Seventh Cause of Action
(Violations of the Forest and Rangeland Renewable Resources Planning Act)

135.     The plaintiffs incorporate all the above paragraphs herein by reference.

136.     The Forest Service's failure to undertake an analysis of the relative values of all the

various National forest natural resources in its national-level, forest level, and timber sale level

planning analyses -- including the analyses required by 16 U.S.C. §§1601, 1602, 1604, 1606(b),

and 1606(d) -- violates the procedural obligations imposed by the RPA and the APA and makes

it impossible for the Forest Service to manage National forest lands and resources in a way that

maximizes net public benefit or otherwise fully accounts for all the market and non-market social

and economic benefits and costs associated with National forest lands and logging on those

lands.

137.    The Forest Service's failure to account for the all the market and non-market social and

economic benefits and costs of its management plans and activities in its national-level, forest

level, and timber sale level planning analyses -- including the analyses required by 16 U.S.C.

§§1601, 1602, 1604, 1606(b), and 1606(d) -- violates the RPA and the APA and makes it

impossible for the Forest Service to comply with its substantive obligation to manage National

forest lands and resources in a way that maximizes net public benefit or otherwise fully accounts

for all market and non-market social and economic benefits and costs associated with National

forest lands and logging on those lands.

Eighth Cause of Action<br>(Violations of the National Forest Management Act)

138.    The plaintiffs incorporate all the above paragraphs herein by reference.

139.    The Forest Service's failure to undertake an analysis of the relative values of all the

various National forest natural resources in its national level, forest level, and timber sale level

planning analyses -- including the analyses required by 16 U.S.C. §§1601, 1602, 1604, 1606(b),

and 1606(d) -- violates the procedural obligations imposed by NFMA and the APA and makes it

impossible for the Forest Service to manage National forest lands and resources in a way that

maximizes net public benefit or otherwise fully accounts for all the market and non-market social

and economic benefits and costs associated with National forest lands and logging on those

lands.

140.    The Forest Service's failure to account for the all the market and non-market social and

economic benefits and costs of its management plans and activities in its national-level, forest

level, and timber sale level planning analyses -- including the analyses required by 16 U.S.C.

33

§§1601, 1602, 1604, 1606(b), and 1606(d) -- violates NFMA and the APA and makes it

impossible for the Forest Service to comply with its substantive obligation to manage National

forest lands and resources in a way that maximizes net public benefit or otherwise fully accounts

for all market and non-market social and economic benefits and costs associated with National

forest lands and logging on those lands.

Ninth Cause of Action
(Violations of the National Environmental Policy Act)

141.    The plaintiffs incorporate all the above paragraphs herein by reference.

142.    The Forest Service's failure to conduct a cumulative impacts analysis of the direct,

indirect, and cumulative impacts of its timber sale activities that fully discloses the effects of

Forest Service timber sale activities on the various National forest natural resources constitutes a

violation of the NEPA and the APA and makes it impossible for the Forest Service to manage

National forest lands and resources in a way that maximizes net public benefit or otherwise fully

account for all the market and non-market social and economic benefits and costs associated with

logging on National forests.

143.    The Forest Service's failure to utilize the best available methodologies for assessing all

the market and non-market social and economic benefits and costs associated with the Forest

Service's timber sale activities constitutes a violation of the NEPA and the APA and makes it

impossible for the Forest Service to manage National forest lands and resources in a way that

maximizes net public benefit or otherwise fully accounts for all the market and non-market social

and economic benefits and costs associated with National forest lands and logging on those

lands.

34

## **REQUESTS FOR RELIEF**

144.    The plaintiffs respectfully request that this Court declare that the Forest Service action to mark trees for logging prior to project authorization to be illegal.

145.    The plaintiffs respectfully request that this Court declare that the Forest Service analyses for the Old Joe Project is illegal and in violation of MUSY, the RPA, NFMA, and NEPA, including (1) the site-specific planning analyses and decisions in the for the Old Joe Project; (2) the Land and Resource Management Plan and plan amendment for the Green Mountain National Forest; and (3) the national-level planning analyses and decisions, including but not limited to the RPA Program and Assessments and all other analyses prepared to justify or support the Old Joe Project.

146.    The plaintiffs respectfully request that this Court order the Forest Service to comply with Congress's mandates in MUSY, the RPA, NFMA, the NEPA, the APA, and with the Forest Service regulations and rules.

147.    The plaintiffs respectfully request that this Court establish a timetable for compliance.

148.    The plaintiffs respectfully request that this Court retain jurisdiction over this matter until such time as the Forest Service has complied with its duties to acquire and analyze management indicator species population information, and to incorporate all natural resource values and costs into its land management decisions.

149.    The plaintiffs respectfully request that this Court issue any and all appropriate injunctive and mandatory relief appropriate and necessary to effect the declaratory and/or mandatory relief issued by the Court.

150.    The plaintiffs respectfully request that this Court issue such other relief as it determines to be just and proper.

151.    The plaintiffs respectfully request that this Court award them their reasonable costs and attorneys' fees incurred in the prosecution of this action.

Respectfully submitted,

Dated: Burlington, Vermont, February 18, 2003

Brian Dunkiel, I.D. # 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
John Harbison
SHEMS DUNKIEL & KASSEL PLLC
87 College Street
Burlington, VT 05401
(802) 860-1003

Steven Sugarman
Letty Belin
BELIN & SUGARMAN
618 Paseo de Peralta
Santa Fe, NM 87501
(505) 983-1700
*Attorneys for the Plaintiffs*

36